UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
FAIR HOUSING JUSTICE CENTER, INC.,

                    Plaintiff,

         -against-

                                       19 Civ. 1171 (AT) (GWG)

JDS DEVELOPMENT LLC;
616 FIRST AVENUE LLC; 202 8th LLC;
SHOP ARCHITECTS LLP;
PROPERTY MARKETS GROUP, INC.;
WERBER MANAGEMENT, INC.; and,
202 PARK SLOPE LLC,

                    Defendants.
----------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PROPERTY
MARKETS GROUP, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT**

                                      CUTI HECKER WANG LLP
                                      305 Broadway, Suite 607
                                      New York, New York 10007
                                      (212) 620-2600

                                      *Attorneys for Plaintiff Fair Housing Justice Center,
Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTS ............................................................................................................................... 2

STANDARD OF REVIEW ............................................................................................... 4

ARGUMENT ..................................................................................................................... 4

   I.   PLAINTIFF'S FEDERAL FAIR HOUSING ACT CLAIMS ARE TIMELY ................ 4

      A.  The Statutory Text, Legislative History, and Administrative Interpretation .............. 4

      B.  The Case Law ....................................................................................................... 10

      C.  PMG's Motion to Dismiss the Federal Claims Should Be Denied ......................... 14

           1.  Plaintiff's Federal Claims Are Timely Because the "Discriminatory Housing Practice" Is Not "Terminat[ed]" Until the Violation Is Remedied ................................................................................................... 14

           2.  Plaintiff's Federal Claims Are Timely Because They Were Brought Less Than Two Years After Plaintiff Was Injured .................................................... 16

           3.  The Statute of Limitations Does Not Begin to Run When the Certificate of Occupancy Is Issued or the Last Unit Is Sold .................................................. 18

           4.  The Discovery Rule Applies ........................................................................... 21

           5.  PMG's Ongoing Unlawful Conduct Renders Plaintiff's Claims Timely ............ 23

   II.  PLAINTIFF'S STATE AND LOCAL LAW CLAIMS ARE ALSO TIMELY ............. 26

CONCLUSION .............................................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*2 Perlman Drive, LLC v. Stevens*, 54 Misc.3d 1215(A) (N.Y. Civ. Ct. 2017) ........................... 27

*Adkins v. Stanley*, No. 12 Civ. 7667 (HB), 2013 WL 3835198 (S.D.N.Y. July 25, 2013) ......... 21

*Alliance for Disabled in Action inc. v. Renaissance Enters., Inc.*,
371 N.J. Super 409 (App. Div. 2004) .................................................................................. 25

*Aschroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 4

*Barkley v. Olympia Mortg. Co.*, No. 04 Civ. 875 (RJD)(KAM),
2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007) ................................................................... 24

*Buffalo Transp., Inc. v. United States*, 844 F.3d 381 (2d Cir. 2016) ........................................... 9

*City of Edmonds v. Oxford H., Inc.*, 514 U.S. 725 (1995) ............................................................ 5

*Clement v. United Homes, LLC*, 914 F. Supp. 2d 362 (E.D.N.Y. 2012) ....................................... 4

*Cornwell v. Robinson*, 23 F.3d 694 (2d Cir. 1994) ................................................................... 15

*Croci v. Town of Haverstraw*, 175 F. Supp. 3d 373 (S.D.N.Y. 2016) ....................................... 23

*E. Paralyzed Veterans Assoc., Inc. v. Lazarus-Burman Assocs.*,
133 F. Supp. 2d 203 (E.D.N.Y. 2001) ......................................................................... 10, 15

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014) ....................................... 4

*Fagundes v. Charter Builders, Inc.*, No. C-07-0111 (JF)(HRL),
2007 WL 2113575 (N.D. Cal. July 20, 2007) ................................................................... 25

*Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*,
210 F. App'x 469 (6th Cir. 2006) ................................................................. 11, 12, 20, 25

*Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266 (S.D.N.Y. 2019) .................................... 16

*Garcia v. Brockway*, 526 F.3d 456 (9th Cir. 2008) ............................................................. *passim*

*Hack v. President & Fellow of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000) ....................................... 5

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................................... 5, 7, 17

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir.1988) ................. 5

*Johnson v. DCM Erectors, Inc.*, No. 15-CV-5415 (PKC),
    2016 WL 407293 (S.D.N.Y. Feb. 2, 2016)............................................................ 26

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ............................................... 17

*Kuchmas v. Towson Univ.*, 553 F. Supp. 2d 556 (D. Md. 2008) ................................... 25

*Kumar v. New York City Sch. Constr. Auth.*, No. 10 Civ. 3559 (PKC)(FM),
    2011 WL 5929005 (S.D.N.Y. Nov. 29, 2011) ........................................................ 27

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)....................................4, 25

*Lloyd v. WABC-TV*, 879 F. Supp. 394 (S.D.N.Y. 1995) ............................................... 16

*Martinez by Martinez v. Lexington Gardens Assocs.*,
    336 F. Supp. 3d 270 (S.D.N.Y. 2018) ............................................................... 26-27

*Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144 (2d Cir. 2013) ............ 5

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010) ................................................... 22

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013)...... 27

*Montana Fair Hous., Inc. v. Am. Capital Dev., Inc.*,
    81 F. Supp. 2d 1057 (D. Mont. 1999) .................................................................6, 10

*Moseke v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492 (E.D. Va. 2002).................... 25

*Nat'l Fair Hous. Alliance, Inc. v. HHHunt Corp.*, 919 F. Supp. 2d 712 (W.D. Va. 2013).......... 24

*Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296 (2d Cir. 2006) ....................... 25

*Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014) ........................................... 26

*Ortiz v. Cornetta*, 867 F.2d 146 (2d Cir. 1989) ............................................................ 4

*Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608,
    2013 WL 135216 (S.D.N.Y. Jan. 10, 2013) .......................................................... 23

*Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249 (E.D.N.Y. 2009) ............................... 26

*Siegel v. La Guardia Cmty. Coll.*, No. 05-CV-320 (SLT)(RER),
    2006 WL 1084780 (E.D.N.Y. Apr. 25, 2006) ....................................................... 22

*Silver State Fair Hous. Council, Inc. v. ERGS, Inc.*, 362 F. Supp. 2d 1218 (D. Nev. 2005) ....... 24

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................... 9

*St.-Jean v. Emigrant Mortg. Co.*, No. 11-CV-2122(SJ)(JO),
    2014 U.S. Dist. LEXIS 136563 (E.D.N.Y. Mar. 31, 2014).................................... 28

*St.-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300 (E.D.N.Y. 2014) .........................21, 22, 28

*The Equal Rights Ctr. v. AvalonBay Comtys., Inc.*, No. AW-05-2626,
    2009 WL 1153397 (D. Md. Mar. 23, 2009) ......................................................... 24

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) .......................................... 5

*United States v. Aguilar*, 585 F.3d 652 (2d Cir. 2009) ............................................. 5

*United States v. Taigen & Sons, Inc.*, 303 F. Supp. 2d 1129 (D. Idaho 2003) ........................... 25

*United States v. Tanski*, 1:04-CV-714, 2007 WL 1017020 (N.D.N.Y. Mar. 30, 2007)................. 6

*United States v. Yonkers Bd. of Educ.*, 992 F. Supp. 672 (S.D.N.Y. 1998) ..........................15, 26

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) ...................................... 4

**STATUTES**

42 U.S.C. § 3602 .......................................................................................... 6

42 U.S.C. § 3604 ......................................................................................6, 7, 18

42 U.S.C. § 3613 ......................................................................................6, 9, 16

N.Y. Exec. Law § 296 ...................................................................................26, 27

N.Y.C. Admin. Code § 8-107 .........................................................................26, 27, 28

Fair Housing Amendments Act of 1988, P.L. 100-430,102 Stat. 1619 (1988)............................. 7

**OTHER AUTHORITIES**

134 Cong. Rec. 19,749 (1988) (Bound Edition)...................................................... 15

H.R. Rep. No. 100-711 (1988)......................................................................*passim*

U.S. Dep't of Hous. & Urban Dev., *Fair Housing Act Design Manual:*
    *A Manual To Assist Designers and Builders in Meeting the Accessibility*
    *Requirements of the Fair Housing Act* (rev. 1998) ............................................. 8-9

U.S. Dep't of Hous. & Urban Dev., *Title VIII Complaint Intake, Investigation,*
    *and Conciliation Handbook* (rev. 2005)....................................................... 9

Plaintiff Fair Housing Justice Center, Inc. ("FHJC") submits this memorandum in opposition to the motion filed by Defendant Property Markets Group, Inc. ("PMG") seeking dismissal of Plaintiff's Amended Complaint.

## PRELIMINARY STATEMENT

The question presented is when the two-year statute of limitations begins to run in a case involving the failure to design and construct accessible housing in violation of federal, state, and local fair housing laws. The Fair Housing Act ("FHA") is an unusually broad and remedial statute enacted to eradicate the significant barriers – both physical and legal – that disabled individuals face in finding accessible housing. The legislative history confirms beyond dispute that when Congress amended the statute in 1988 to add accessibility requirements, it lengthened the statute of limitations in order to expand the statute's protections. The case law confirms beyond dispute that given the statute's broad remedial purpose, courts must construe its provisions liberally.

PMG invites this Court to do the opposite, asserting unpersuasively that the only available reading of the FHA's statute of limitations is that the clock begins to run either when "the final certificate of occupancy is issued" or when "the last inaccessible housing unit is sold." *See* Memorandum of Law of Defendant Property Markets Group, Inc., ECF No. 111 ("PMG MOL"), at 2. As shown below, that self-servingly narrow conclusion enjoys no support in the statute's text, legislative history, or administrative interpretation, in the liberal construction requirement that applies, or in common sense. Indeed, each of the two very different rules PMG appears to be suggesting is completely arbitrary because neither the issuance of the certificate of occupancy nor the date the last unit in a building is sold has any connection to when, in the words of the statute, the "discriminatory housing practice" "occur[s]" or "terminat[es]" or when

1

a plaintiff becomes "aggrieved." Here, moreover, PMG's proposed "last unit sold" rule is not even available because this is a rental building.

As shown below, the text of the statute, its legislative history, and the case law interpreting it strongly support the conclusion that the two-year statute of limitations does not begin to run until the accessibility violation is remedied, which is what the U.S. Department of Housing and Urban Development ("HUD") has repeatedly said. Alternatively, at a minimum, the statute of limitations does not begin to run until the plaintiff experiences the discrimination and therefore suffers an injury. And even if the Court were to accept PMG's strained interpretation of the statute, the discovery rule and the continuing violation doctrine both beg factual questions that render PMG's motion at best premature.

For these reasons and those reasons that follow, PMG's motion should be denied.

## FACTS

FHJC is a non-profit organization dedicated to ensuring equal access to housing opportunities for all New Yorkers. Amended Complaint, ECF No. 94 ("Compl.") ¶ 13. Since 2005, FHJC has employed multiple strategies in its quest to promote open, accessible, and inclusive communities, which include without limitation (a) providing information to the public about fair housing laws, (b) providing intake counseling to individuals and organizations with allegations about housing discrimination, (c) conducting testing and other investigations of allegations of housing discrimination, (d) making legal referrals to cooperating attorneys, (e) assisting the preparing and filing of administrative housing discrimination complaints, and (f) providing post-referral litigation support services. Compl. ¶¶ 28-29.

As part of its efforts to investigate and eradicate housing discrimination, FHJC conducted testing of two residential properties: the American Copper Buildings, located at 626 1st Avenue

in Manhattan, and 202 Eighth Street in Brooklyn (collectively, the "Subject Properties"). Compl. ¶¶ 11-12, 33, 35, 42. Over three days of investigation at the Subject Properties, trained FHJC testers observed numerous inaccessible features in violation of federal, state, and local fair housing laws. Compl. ¶¶ 36, 43. As relevant to the instant motion, FHJC testers visited 202 Eighth Street on August 29, 2018 and observed, *inter alia*, that the main entrance door was extremely heavy and could not be opened automatically, and that no doorman was present and able to help open the front door between 11:00 p.m. and 7:00 a.m.; that the mailboxes were obstructed by a shelf under the lowest mailbox; that the highest mailbox was too high; that the interior doorways to all observed bathrooms and bedrooms were too narrow; that the walk-in closet doorway in at least one unit was too narrow; that the terrace in at least one unit had a high threshold; that environmental controls in each unit visited were not in an accessible location; that there was insufficient room in the galley kitchen in at least one unit visited; and the bathrooms lacked clear floor space. Compl. ¶¶ 42, 43(a)-(h). Plaintiff commenced this lawsuit on February 7, 2019. ECF No. 1.

The Subject Properties were developed by Defendants JDS, 202 8th LLC, and/or 616 First Avenue LLC (the "JDS Defendants"). Defendant PMG developed 202 Eighth Street in partnership with JDS. Compl. ¶ 18. Defendants Werber Management, Inc. ("Werber") and its related entity 202 Park Slope LLC (collectively, the "Werber Defendants") currently own and/or manage 202 Eighth Street. Compl. ¶¶ 19-20. Defendant SHoP Architects LLP ("Shop") provided architectural services for the design and construction of the American Copper Buildings. Compl. ¶ 17.

PMG currently is partnering with JDS and Shop in the design and construction of a new residential property located at 111 West 57th Street, which is scheduled to be ready for

occupancy in 2019, and Plaintiff is therefore unable currently to assess whether the design and construction of that building – and others currently underway – comply with the fair housing laws. Compl. ¶¶ 47-48. Because of the regular and ongoing practice of designing and constructing inaccessible housing – established by the numerous violations observed in the testers' visits to the Subject Properties – it is likely that Plaintiff will be injured by the future design and construction of other residential properties by JDS and its partners. Compl. ¶ 49.

## STANDARD OF REVIEW

PMG has moved to dismiss Plaintiff's claims against it under Rule 12(b)(6). PMG MOL at 2, 4. Such a motion must be denied if the complaint "'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Littlejohn v. City of New York*, 795 F.3d 297, 309 (2d Cir. 2015) (quoting *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Ordinarily, the statute of limitations defense is an affirmative defense that must be raised in the defendant's answer; however, it may be raised on a Rule 12(b)(6) motion only "if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 788 n.12 (2d Cir. 2014). A motion for dismissal based on the statute of limitations "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 369 (E.D.N.Y. 2012) (quoting *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989)).

## ARGUMENT

### I.     PLAINTIFF'S FEDERAL FAIR HOUSING ACT CLAIMS ARE TIMELY

#### A.     The Statutory Text, Legislative History, and Administrative Interpretation

The general rule is that the text of a statute "is the lodestar of statutory interpretation." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 115 (2d Cir. 2018). "At the outset," a court must

"review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013) (quoting *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)).

But the FHA is not an ordinary statute. Rather, it is an unusually broad statute with an unusually broad remedial mandate. The FHA "[is] part of a coordinated scheme of federal civil rights laws enacted to end discrimination," and therefore "must be construed expansively to implement that goal." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988), *aff'd in part*, 388 U.S. 15 (1988); *see also City of Edmonds v. Oxford H., Inc.*, 514 U.S. 725, 731 (1995) (discussing the FHA's "'broad and inclusive" compass,' and the need to "accord[] a 'generous construction'" to its provisions) (citation omitted); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the Act is broad and inclusive."); *Hack v. President & Fellow of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000) ("The Supreme Court has repeatedly directed the courts to give a 'generous construction' to the Fair Housing Act.") (citation omitted), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S 506 (2002). The Supreme Court has cautioned against a "wooden" application of FHA provisions, stressing the "broad remedial intent of Congress embodied in the [Fair Housing] Act." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

Congress continued this tradition of broad, remedial legislation when it enacted the Fair Housing Amendments Act ("FHAA") in 1988 to expand the FHA's protections to people with disabilities. Congress intended the FHAA to be "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." H.R. Rep. No. 100-711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179

("House Report").  Courts have repeatedly affirmed that the broad construction required of the

FHA applies equally to the FHAA's provisions pertaining to the design and construction of

accessible buildings.  *See United States v. Tanski*, 1:04-CV-714, 2007 WL 1017020, at *22

(N.D.N.Y. Mar. 30, 2007) ("The Court agrees with those courts that have held that liability under

the Fair Housing Act for discriminatory design and construction should be imposed broadly.");

*Montana Fair Hous., Inc. v. Am. Capital Dev., Inc.*, 81 F. Supp. 2d 1057, 1069 (D. Mont. 1999)

(affirming that "the design and construction language ... should be read broadly.").

Viewed through this required liberal lens, the textual analysis of the FHA's limitations

period begins with 42 U.S.C. § 3613(a)(1)(A), which creates the private right of action at issue in

this case and provides that:

> An aggrieved person may commence a civil action . . . not later than 2 years after
> the occurrence or the termination of an alleged discriminatory housing
> practice . . . to obtain appropriate relief with respect to such discriminatory
> housing practice . . . .

The key language in this section is an "aggrieved person" and "the occurrence or the termination

of an alleged discriminatory housing practice," which begs three questions:  who is an

"aggrieved person," what is a "discriminatory housing practice," and when does the

discriminatory housing practice "occur[] or . . . terminat[e]"?

Section 3602(f) defines the term "discriminatory housing practice" to mean any act that is

rendered unlawful by various specified sections of the FHA, including § 3604.  Sections

3604(f)(1) and (f)(2) in turn make clear that a "discriminatory housing practice" includes

discrimination on the basis of handicap:  §§ 3604(f)(1) and (f)(2) make it unlawful to

"discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any

buyer or renter because of a handicap" or to "discriminate against any person in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection with such dwelling, because of a handicap." Section 3604(f)(3) then provides examples ("discrimination includes") of the kinds of discrimination that violate §§ (f)(1) and (f)(2), including "a failure to design and construct" covered multifamily dwellings in compliance with required accessibility standards.

It is critical that when Congress enacted the FHAA in 1988, it added the word "termination" into § 3613(a)(1)(A) so that the two-year filing deadline is measured not just from the "occurrence" of the discriminatory housing practice but rather from the "occurrence or termination" of the discriminatory housing practice. *See* Fair Housing Amendments Act of 1988, P.L. 100-430,102 Stat. 1619, § 8 (1988). The legislative history makes clear that Congress inserted the word "termination" in order to "reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice." House Report at 33; *see also Havens Realty Corp.*, 455 U.S. at 380-81 (recognizing the applicability of the continuing violation doctrine to the FHA even before the word "termination" was added through the FHAA). The text of the statute thus makes clear that where a discriminatory housing practice already has "occurred" but still continues to exist, the statute of limitations does not begin to run until such practice has been "terminated."

These provisions, taken together, strongly suggest that in a FHA design and construction case, the statute of limitations is triggered when the non-compliant feature of the housing unit at issue has been cured. So long as the non-compliant feature continues to exist, the participants in the design and construction process continue to "discriminate in the sale or rental" of housing and/or "to otherwise make unavailable or deny" compliant housing under §§ 3604(f)(1) and (f)(2) by virtue of the inaccessible design and construction of the dwellings. Thus, so long as the housing remains inaccessible to disabled persons, the "discriminatory housing practice" has not

been "terminated." It is one thing for a developer to escape liability because a suit was not brought soon enough after the problem was fixed. It is another thing entirely for a developer to escape liability for a problem that continues to persist.

This interpretation is not just reasonable in light of the statutory text and the well-established requirement that the FHA must be construed broadly to effectuate its remedial purpose. It also is consistent with the statute's legislative history, which underscores Congress's desire to bolster the opportunity for meaningful private enforcement of the FHA. When Congress enacted the FHAA, the House Report stated that enforcement of the FHA by private parties had been "hampered by a short statute of limitations" and that "[e]xisting law ha[d] been ineffective because it lack[ed] an effective enforcement mechanism." House Report at 16. The bill was intended to "strengthen[] the private enforcement section by expanding the statute of limitations." *Id.* at 17. And as noted above, the House Report stated specifically that the FHAA added the word "termination" to § 3613(a)(1)(A) to "reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice." *Id.* at 33.

Consistent with the statute's text and legislative history, HUD has taken the position repeatedly that a lawsuit can be brought at any time that a building remains in non-compliance with the Act's provisions. *See, e.g.*, U.S. Dep't of Hous. & Urban Dev., *Fair Housing Act Design Manual: A Manual To Assist Designers and Builders in Meeting the Accessibility Requirements of the Fair Housing Act* 22 (rev. 1998) ("With respect to the design and construction requirements, complaints could be filed at any time that the building continues to be in noncompliance, because the discriminatory housing practice – failure to design and construct

the building in compliance – does not terminate.")[1]; *see also* U.S. Dep't of Hous. & Urban Dev., *Title VIII Complaint Intake, Investigation, and Conciliation Handbook* 3-5 (rev. 2005) ("A complainant aggrieved because an otherwise covered multifamily dwelling unit was not designed and constructed [properly] ... may allege a continuing violation regardless of when construction of the building was completed.").[2]  HUD's interpretation is of course entitled to deference.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016) ("An informal agency interpretation that is neither a formal adjudication nor a promulgated rule may still receive deference under *Skidmore v. Swift & Co*.").

To be sure, that is not the only possible reading of the FHA.  One could argue that in a design and construction case, the "discriminatory housing practice" is the design and construction of the unit in question – which by definition happens long before a unit is sold or rented – notwithstanding the language in §§ 3604(f)(1) and (f)(2) stating expressly that the "discriminatory housing practice" is not just "the sale or rental" of non-compliant housing but also "deny[ing]" compliant housing and "otherwise mak[ing]" it "unavailable" to prospective tenants, which designing and constructing inaccessible housing surely does.  But even if one were to ignore the express language of §§ 3604(f)(1) and (f)(2), the word "aggrieved" in § 3613(a)(1)(A) still makes clear, at a minimum, that the statute of limitation does not begin to run until a plaintiff is injured.

---

[1] Available at https://www.huduser.gov/portal/publications/PDF/FAIRHOUSING/fairfull.pdf.
[2] Available at:  https://www.hud.gov/sites/documents/80241C3-1FHEH.PDF.

## B.     The Case Law

The analysis of the issue presented in this motion is informed by the prior decisions of several other courts, none of which is binding on this Court, but each of which merits consideration.

In *Eastern Paralyzed Veterans Association, Inc. v. Lazarus-Burman Associates*, 133 F. Supp. 2d 203 (E.D.N.Y. 2001), the Court denied a similar motion to dismiss by a developer defendant. Notably, the developer defendant in that case did not argue that the statute of limitations began to run when the last unit was first sold. Rather, the developer defendant conceded that the statute of limitations did not begin to run until the plaintiffs became aware of the alleged FHA violations, and it merely contended that the claim was time-barred because it was brought more than two years after the plaintiffs discovered the alleged violations. *Id.* at 212. The Court rejected that argument, holding that it was precluded by the continuing violation doctrine because the alleged non-compliance still had not been remedied when litigation was commenced. *Id.* at 213; *accord Montana Fair Hous., Inc. v. Am. Capital Dev., Inc.*, 81 F. Supp. 2d 1057, 1063 (D. Mont. 1999) (rejecting argument that FHA claim was time-barred because plaintiff filed more than two years after the injury was discovered; under the continuing violation doctrine, the statute of limitations did not begin to run until the statutory violation was remedied).

These two cases embrace the continuing violation interpretation of the FHAA. This interpretation is faithful to the language in §§ 3604(f)(1) and (f)(2) that a "discriminatory housing practice" includes any practice that amounts to the "den[ial]" or "mak[ing] unavailable" of compliant units, which the unlawful design and construction of non-compliant units surely

does.  It is also faithful to Congress's clearly purposeful decision to add the word "termination" to § 3613(a)(1)(A) to ensure that continuing violations do not go unremedied.

The Sixth Circuit adopted a somewhat different approach in *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469 (6th Cir. 2006).  In that case, the developer defendant argued that the statute of limitations began to run when the design and construction of the building ended, and the plaintiff invoked the continuing violation doctrine.  The Court expressly rejected the developer's argument that the conclusion of the design and construction phase of the development necessarily triggers the running of the statute of limitations.  The Court noted that this argument could not be squared with the text of §§ 3604(f)(1) and (f)(2).  *See id.* at 480.  The Court also found that this proposed rule would run afoul of the requirement that the FHA must be interpreted broadly to effectuate its remedial purpose because "[o]ften, housing units go unsold or unlet for some time after they are built," and "potential buyers may not even look at the property until" more than two years after the design and construction is completed.  *Id.*  But the Court declined to impose a bright-line rule, holding instead that in a design and construction case, "the limitations period will depend on the specific circumstances of each case."  *Id.* at 481.  The Court held that "where a disabled individual seeks to buy a particular unit and discovers that the unit is inaccessible because it is not designed in conformity with the FHA, the limitations period for that individual's claim would begin to run from the date that the individual attempted to buy the unit and discovered the nonconforming conditions."  *Id.*  In other words, the limitations period begins to run when the

problem is discovered, not when it is fixed. Because the fair housing organizations who brought that case had sent in their testers less than two years before they sued, the suit was timely. *Id.*[3]

Most recently, the *en banc* Ninth Circuit split sharply in *Garcia v. Brockway*, 526 F.3d 456 (9th Cir. 2008). In his majority opinion, Judge Kozinski concluded that in a design and construction case, the statute of limitations is triggered at the conclusion of that phase, "which occurs on the date the last certificate of occupancy is issued." *Id*. at 461. Judge Kozinski rejected the argument that the discriminatory housing practice continued without terminating until the violation was remedied, holding that "failing to design and construct" in a lawful manner "is a single instance of unlawful conduct." *Id*. at 463. Judge Kozinski also rejected the argument that the statute of limitations did not begin to run until the plaintiff first encountered the design defect, holding that "it goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims . . . [b]ut that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable." *Id*. at 464 (quotation omitted).

Judge Fisher vigorously dissented, arguing that "the most plausible reading of the statute is that the limitations period begins (at the earliest) when a disabled person actually experiences discrimination – either in attempting to buy or rent a noncompliant housing unit, in 'testing' such

---

[3] *Fair Housing Council* also contains the following perplexing sentence: "However, in a case such as the instant case, where the plaintiff alleges that the owner or developer engaged in a policy or practice throughout the entire development of constructing housing units that fail to comply with the FHA, the continuing violation doctrine applies to toll the statute of limitations until the sale of the last unit in that development." 210 F. App'x at 481. It is not clear why the Court apparently believed that the statute of limitations would begin to run at different times depending on whether there was a violation in one unit or multiple units. In any event, this dictum was not necessary to the Court's holding, and the Court stated expressly that it was not considering which rule would apply to cases such as this one, which involve rental units. *Id*. n.6.

a unit or upon moving in as a tenant." *Id.* at 467 (Fisher, J., dissenting). Judge Fisher focused on

the bedrock tort rule that a statute of limitations does not begin to run until a plaintiff's cause of

action accrues, observing that under the majority's approach, "a real estate developer or landlord

of a noncompliant building will often be immunized from suit long before a particular disabled

individual has been injured and able to challenge the noncompliant features." *Id.* at 468.

Applying the plain text of the statute, Judge Fisher argued that under §§ 3604(f)(1) and (f)(2), the

"discriminatory housing practice" is the more general act of making compliant housing

"unavailable," not the more specific act of designing and constructing non-compliant housing,

and that the reference to "a failure to design and construct" in § 3604(f)(3)(C) "is best read as a

specific *example* of the discrimination that in fact becomes actionable under § 3604(f)(1) and

§ 3604(f)(2)." *Id.* at 470 (emphasis in original). Judge Fisher noted that before an individual

"first attempts to buy or rent or tests a FHA-noncompliant unit," that individual "has not been

subjected to any discriminatory action," and therefore is not even an "aggrieved person" who is

entitled to sue. *Id.* at 469, 472-73. An unlawfully designed building therefore is "much like a

potentially dangerous ditch into which no one has yet fallen – capable of inflicting harm and

violating the law, but not yet actually doing either." *Id.* at 471.

     Judges Pregerson and Reinhardt joined Judge Fisher's dissent and wrote separately to

emphasize the untenable consequences of the majority's approach:

> [A] disabled person who seeks to acquire an FHA non-compliant unit in a housing
> development more than two years after the development is certified for occupancy
> cannot sue the developer even if no person familiar with the needs of disabled
> persons had previously seen the property and no disabled person had been aware
> of or injured by the violation until the would-be plaintiff attempted to buy or lease
> the unit. It seems apparent to us that Congress intended the statute of limitations
> to have the opposite result: that the disabled person who is injured by the
> developer's violation of the FHA should be able to sue that developer if he
> institutes his action within two years of the injury. It did not intend to invite the
> developer to assume the risk of non-compliance, in order to save construction

costs, by taking the chance that his violation of the law would remain undiscovered by the disabled community for a period of two years.

*Id*. at 467 (Pregerson, J., dissenting).

### C.    PMG's Motion to Dismiss the Federal Claims Should Be Denied

The cases discussed above identify four different possible interpretations of the FHAA's statute of limitations provision.  The statute of limitations could begin to run:  (1) when the violation is remedied; (2) when the plaintiff is injured; (3) when the plaintiff discovers the injury; or (4) when the design and construction phase is deemed to have ended.  As shown below, any of the first three interpretations is far more supportable than the fourth, and in any event, PMG's motion must be denied no matter which interpretation the Court deems appropriate.

### 1.    Plaintiff's Federal Claims Are Timely Because the "Discriminatory Housing Practice" Is Not "Terminat[ed]" Until the Violation Is Remedied

As discussed above, HUD has taken the position in multiple publications that a lawsuit can be brought any time that a building remains in non-compliance with the FHAA's accessibility requirements, and that administrative interpretation is entitled to deference.  *See supra* at 8-9.  This "continuing violation" interpretation is most consistent with the plain language and legislative history of the statute for two independent reasons.  First, the 1988 amendments make clear that Congress inserted the word "terminated" into § 3613(a)(1)(A) in order to "reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice," House Report at 33, and Plaintiff alleges that the violations are ongoing.  Second, §§ 3604(f)(1) and (f)(2) define the term "discriminatory housing practice" broadly to include the "den[ial]" and "mak[ing] unavailable" of compliant housing, and surely "mak[ing]" compliant housing "unavailable" and "deny[ing]" it includes not just selling or renting it but also designing and building it in the first

14

place. Perhaps most importantly, the "continuing violation" interpretation is most faithful to the well-established requirement that the statute must be construed broadly to effectuate its remedial purpose.

Ignoring the statute's plain language, legislative history, administrative interpretation, and liberal construction requirement, PMG focuses narrowly on and attempts to distinguish the *Eastern Paralyzed Veterans* case. PMG MOL at 7-9. But contrary to PMG's contention, the *Eastern Paralyzed Veterans* Court did not base its rejection of the statute of limitations defense on any allegations of ongoing discriminatory practices by the building's sales office. Rather, the Court specified that the ongoing discriminatory practice was the continued unavailability of the housing to disabled persons, in the form of the continued absence of ramps, insufficiently wide doorways and hallways, and inaccessible light switches and environmental controls. 133 F. Supp. 2d at 212-13 (citing *Cornwell v. Robinson*, 23 F.3d 694 (2d Cir. 1994), and *United States v. Yonkers Bd. of Educ.*, 992 F. Supp. 672, 675 (S.D.N.Y. 1998)). Moreover, the fact that the sales office had said that there were no accessible apartments for people with disabilities is not a basis for distinguishing *Eastern Paralyzed Veterans* because the FHAA's legislative history makes clear that persistent inaccessible building features are tantamount to statements that people with disabilities are not welcome in the building. *See* House Report at 25 ("A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying 'No Handicapped People Allowed.'"); 134 Cong. Rec. 19,749 (1988) (Bound Edition) (statement of Sen. Simon) (noting that architectural barriers "are like 'Keep Out' signs to a substantial part of our populations"). In any event, although the *Eastern Paralyzed Veterans* case was correctly decided and is directly on point, our argument that the statute of limitations begins when the

violation is remedied rests on the statute's text, legislative history, consistent agency interpretation, and on common sense and does not rest narrowly on the correctness of *Eastern Paralyzed Veterans.*

The cases PMG cites to try to avoid the applicability of the continuing violation rule do not support its argument. In *Lloyd v. WABC-TV*, 879 F. Supp. 394 (S.D.N.Y. 1995), the Court held that the continuing violations doctrine could not salvage the plaintiff's otherwise untimely Title VII employment discrimination claim rooted in multiple allegedly discriminatory denials of promotion. Under the entirely distinct statutory framework at issue in that case, the Court found that the series of discrete employment actions were not related, and that the plaintiff was not entitled to connect them in order to make his claims timely. *Id.* at 399-400. Here, Plaintiff has alleged a continuing unlawful discriminatory practice in the form of the making unavailable and denying to disabled persons FHA-compliant housing, which is very different from several distinct but unrelated acts of discrimination. And in *Favourite v. 55 Halley Street, Inc.*, 381 F. Supp. 3d 266 (S.D.N.Y. 2019), the Court declined to apply the continuing violation doctrine where "sporadic incidents" of discrimination occurred. *Id.* at 279. The inconsistent nature of the discriminatory conduct alleged in *Favourite* is entirely distinguishable from the consistent unlawful discriminatory practice alleged here. To this day, there has been no break in the unavailability or denial of accessible housing to disabled persons at 202 Eighth Street.

### 2. Plaintiff's Federal Claims Are Timely Because They Were Brought Less Than Two Years After Plaintiff Was Injured

If the Court chooses not to adopt the interpretation urged above, the Court should hold that the statute of limitations does not begin to run until a plaintiff is injured by a discriminatory housing practice. This interpretation also enjoys significant support in the text of the statute, which provides in § 3613(a)(1)(A) that only an "aggrieved person" may bring suit and which

defines "aggrieved person" in § 3602(i) as a person who "claims to have been injured[.]" By definition, a potential plaintiff is not injured by a latent design or construction deficiency until he, she, or it seeks to purchase, rent, or test a non-compliant unit. That is especially true in the case of an organizational plaintiff like the FHJC, whose injury stems in significant part from the diversion of its resources from other mission fulfillment activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). It is axiomatic that an organizational plaintiff does not become "aggrieved" in this manner until it first engages in compliance testing, which in this case occurred less than six months before Plaintiff filed suit. Compl. ¶¶ 42-43.

This interpretation is also faithful to a bedrock principle of tort law: a claim does not accrue until the time of injury. *See, e.g.*, *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000). As Judge Fisher argued cogently in his *Garcia* dissent, "the general rule" is "that statutes of limitations are triggered by the accrual of a plaintiff's cause of action," and it therefore makes no sense that "a real estate developer or landlord of a noncompliant building [would] be immunized from suit long before a particular disabled individual has been injured and able to challenge the noncompliant features." 526 F.3d at 467-68 (Fisher, J., dissenting); *see also id.* at 472-75 (further discussing the accrual rule).

Judge Fisher's analogy to a "potentially dangerous ditch into which no one has yet fallen," which is "capable of inflicting harm and violating the law, but not yet actually doing either," *id.* at 471, is persuasive, especially given how easy it is for developers and builders to avoid liability by simply refraining from building the "potentially dangerous ditch" in the first place. As Judges Pregerson and Reinhardt noted in their separate *Garcia* dissent:

> The Fair Housing Act . . . contains a 30 month grace period that gave developers building new multifamily housing clear notice of what was required to satisfy the

statute's accessibility standards. *See* 42 U.S.C. § 3604(f)(3)(C). There is no
reason that a developer who fails to comply with these requirements should not be
held accountable for such violations.

*Id*. at 466 (Pregerson, J., dissenting) (citation omitted). The FHAA's design and construction

standards are clear. Designers and builders need only follow them. When they do not, it hardly

shocks the conscience to hold, consistent with basic tort law principles, that a plaintiff does not

become "aggrieved," and the limitations clock does not start to run, until the plaintiff experiences

the discrimination.

### 3. The Statute of Limitations Does Not Begin to Run When the Certificate of Occupancy Is Issued or the Last Unit Is Sold

Not surprisingly, PMG urges the Court to adopt the only reading of the statue that it

believes will immunize it from liability: that the limitations clock supposedly starts ticking when

"the final certificate of occupancy is issued or the last inaccessible housing unit is sold." PMG

MOL at 1.

PMG's argument is based on the false premise that the statutory violation is the design of

the non-compliant housing. The plain language of the statute and common sense both belie this

self-serving premise. Sections 3604(f)(1) and (f)(2) are clear that a "discriminatory housing

practice" includes "mak[ing]" accessible housing "unavailable" and otherwise "deny[ing]" it.

Even where the issue is the design and construction of the non-compliant unit, the accessible

housing continues to be "unavailable" and "denied" when a plaintiff first encounters it, and a

plaintiff certainly does not become "aggrieved" until long after the design phase formally

concludes. As Judge Fisher observed, although § 3604(f)(3)(C) refers specifically to non-

compliant "design and construction," the words "discrimination *includes*" (emphasis added) in

that subsection make clear that it was intended only to provide "a specific *example* of the

discrimination that in fact becomes actionable under § 3604(f)(1) and § 3604(f)(2)," and it

remains the *unavailability* and *denial* of the housing to disabled persons that fundamentally is the violation and fundamentally causes the injury. 526 F.3d at 470 (Fisher, J., dissenting) (emphasis in original). We therefore respectfully submit that Judge Kozinski was wrong when he held in *Garcia* that "failing to design and construct is a single instance of unlawful conduct." *Id.* at 463. That simply is not true. *See* 526 F.3d at 471 (Fisher, J., dissenting) ("If the violation is properly characterized as a practice of carrying out the actions prohibited by § 3604(f)(1) and § 3604(f)(2), then it is plain that Appellees' unlawful conduct itself—as opposed to merely its consequences—continues until that practice is halted.") (citations omitted).

Even if the design of the inaccessible housing were the injury, PMG's argument still would be meritless. PMG contends that the two-year clock should begin to run either when "the final certificate of occupancy is issued" or when "the last inaccessible housing unit is sold." *See* PMG MOL at 2. These two proposed rules are markedly different but equally arbitrary and untenable.

By definition, the design phase of a unit ends well before a building regulator finally approves it for occupancy. The issuance of a certificate of occupancy bears no temporal relationship to the acts of designing or constructing a covered dwelling. If, as PMG argues, the appropriate trigger for the limitations clock should be tied to a "discrete incident" by a defendant, PMG MOL at 7-8, it makes no sense to peg the running of the limitations period to the arbitrary date on which a building regulator happens to act. By way of example, if a developer defendant could establish conclusively that it completed the acts comprising its design of inaccessible dwellings, and had no further involvement in the project, long before the certificate of occupancy was issued, there would be no logical basis for starting the limitations clock on the date the certificate was issued.

PMG's proposed "last unit sold" rule is just as arbitrary because the date on which the last unit in a development is sold has nothing to do either with when the developer designs or constructs the non-compliant housing or when a plaintiff is injured by the non-compliance. Moreover, on the facts presented in this case, the "last unit sold" rule is at best a square peg because this is a rental property, not a condominium. PMG's reliance on the Sixth Circuit's decision in *Fair Housing Council* is therefore doubly misplaced. First of all, that case *rejected* the defendant's statute of limitations defense, holding that "where a disabled individual seeks to buy a particular unit and discovers that the unit is inaccessible because it was not designed in conformity with the FHA, the limitations period for that individual's claim would begin to run from the date that the individual attempted to buy the unit and discovered the nonconforming conditions." 210 F. App'x at 481. Second, although the Court in *Fair Housing Council* did say that the limitations period would be triggered by "the sale of the last unit" in a case in which the plaintiff alleges "a policy or practice throughout the entire development," *id*., the Court plainly was referring to the sale of the last unit by the developer *to an occupant*, and the analogous triggering event in this case would be the date on which the last unit at 202 Eighth Street was made available *to a rental tenant*. No court has *ever* held that a developer is immunized from any and all FHA liability when, prior to the project's completion, it sells its rights *to another developer*. Because the date that PMG claims to have sold its interest in the project to 202 Park Slope LLC is totally irrelevant, and because the record on this pre-discovery motion is silent about when the last unit in 202 Eighth Street was rented to a tenant, PMG's motion is at best premature.[4]

---

[4] Again, the Court in *Fair Housing Council* expressly limited its holding to the facts presented in that case and stated explicitly that it was not holding that any "last unit sold" rule would apply to rental housing. See 210 F. App'x at 481 n.6.

PMG argues that allowing this case to proceed would "render the statute of limitations meaningless." PMG MOL at 5. To the contrary, it is PMG's reading that would strip the FHAA of its meaning. As Judge Fisher put it:

> [T]o the extent policy considerations are relevant here, they cut against the majority's position. Under its reading of the statute, the intended beneficiaries of the FHA—disabled persons—are barred from enforcing their right to accessible housing (other than through reasonable modifications at their own expense) as soon as two years have elapsed since the completion of a dwelling's construction. A builder could even construct a FHA-noncompliant dwelling and insulate himself altogether from suit simply by waiting two years to look for tenants.

526 F.3d at 477 (Fisher, J., dissenting) (citation omitted). As shown above, *supra* at 7-8, when Congress enacted the FHAA in 1988, it unquestionably intended to *expand* developer liability and *lengthen* the statute of limitations, not the reverse. PMG's plea – that even though it participated in the design of non-compliant housing in 2013, and even though the noncompliance continues to render housing unavailable to people with disabilities, nobody can hold it accountable – is the opposite of what the plain language of the statute, its legislative history, the relevant administrative guidance, basic tort law principles, common sense, the liberal construction requirement, and fundamental fairness dictate.[5]

### 4.  The Discovery Rule Applies

No matter what interpretation the Court adopts, it should hold that the discovery rule tolls Plaintiff's claims. *See St.-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 315-16 (E.D.N.Y. 2014) (applying discovery rule to conclude that FHA claims were timely); *Adkins v. Stanley*, No. 12 Civ. 7667 (HB), 2013 WL 3835198, at *6 (S.D.N.Y. July 25, 2013) (same). The discovery

---

[5] If a developer wants to sell its interest in a project before it is finished, and if the developer is not fully confident that the project complies with the FHAA, and if the developer wants to insulate itself from FHAA liability, it may seek to obtain contractual indemnification by the successor developer.

rule "delays accrual of a cause of action until the plaintiff has 'discovered' it." *St.-Jean*, 50 F. Supp. 3d at 314 (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010)). "The discovery rule is both a commitment to fundamental fairness and a safeguard against sophisticated schemes that use parameters of the law to facilitate injustices." *Id.*

Plaintiff first encountered the inaccessible features at 202 Eighth Street on August 29, 2018, Compl. ¶¶ 42-43, and commenced this lawsuit less than six months later, ECF No. 1. PMG does not contend – nor could it – that Plaintiff "possessed knowledge, that, with due diligence, would have led to a discovery of the critical facts necessary to sustain a claim" prior to August 2018. *See Siegel v. La Guardia Cmty. Coll.*, No. 05-CV-320 (SLT)(RER), 2006 WL 1084780, at *5 (E.D.N.Y. Apr. 25, 2006) (finding § 1983 claim was time-barred because plaintiff had knowledge of the adverse action sufficient to trigger duty to inquire prior to the limitations period). Instead, PMG argues that Plaintiff was not diligent in failing to discover the violations at 202 Eighth Street prior to August 2018 because (a) Plaintiff conducts testing and other investigations in furtherance of its mission; (b) Plaintiff discovered the numerous FHA violations during "only one visit" to 202 Eighth Street; and (c) Plaintiff "could have discerned the cause of injury at the time it was inflicted, simply … by walking up to the front door." *See* PMG MOL at 6.

The argument that Plaintiff did not exercise due diligence in failing to uncover these violations earlier is absurd because it would impose on Plaintiff an obligation to monitor perpetually every single residential housing property in New York City within two years of the completion of construction of each property. Moreover, discovering the alleged violations at the front door of the building required a trained tester to attempt to open the heavy door and to solicit substantive information about the doorman policy at the building; these violations were not

readily apparent to passersby. And, of course, none of the other violations, which were all located inside the building and the individual apartments, was in any way apparent without entering and exploring the building. Notably, PMG cites no legal authority for its position that the discovery rule does not extend the statute of limitations for Plaintiff's claims.

### 5. PMG's Ongoing Unlawful Conduct Renders Plaintiff's Claims Timely

The case law and legislative history discussed *supra* at 7 highlight that Congress was inspired by the pre-existing continuing violation doctrine when it amended the FHA to clarify that the limitations period does not begin to run until the "termination" of an unlawful discriminatory practice. That concept of a continuing violation is related to, but intellectually distinct from, another form of continuing violation, which permits the statute of limitations to be retriggered when the same defendant engages in separate but similar unlawful discriminatory practices at another property. Even if the Court were to conclude that the two-year statute of limitations was triggered upon the issuance of the final certificate of occupancy in 2013 or upon the sale of the building to a subsequent owner[6] or upon the first sale of the units to occupants, the Amended Complaint alleges more recent discriminatory practices by PMG in the form of its ongoing development activities in partnership with JDS and Shop of a still-incomplete residential

---

[6] Notably, there is no mention of Property Markets Group, Inc. anywhere on the deed of sale PMG has submitted as an exhibit to its moving papers. *See* Ex. A to Decl. of Jeffrey A. Camhi in Support of the Motion to Dismiss the Amended Complaint, ECF No. 112. Even assuming the document demonstrates somehow that PMG's involvement in the property ceased on the date of ownership transfer from 202 8th LLC to 202 Park Slope LLC, PMG's attempt to use the deed of sale to establish that fact on this motion to dismiss runs contrary to the doctrine of judicial notice. *See Croci v. Town of Haverstraw*, 175 F. Supp. 3d 373, 382 (S.D.N.Y. 2016) (quoting *Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608, 2013 WL 135216, at *4 (S.D.N.Y. Jan. 10, 2013)) ("In the motion to dismiss context, however, a court should generally take judicial notice to determine what statements the documents contain[,] not for the truth of the matters asserted."). Drawing all inferences in Plaintiff's favor, as the Court must on this motion to dismiss, the deed of sale has no bearing on Plaintiff's allegations about PMG's involvement in 202 Eighth Street.

development property in Manhattan.  Compl. ¶¶ 47-49.  Cases interpreting the FHA have repeatedly held that such ongoing discriminatory conduct independently constitutes a continuing violation sufficient to retrigger the statute of limitations and make Plaintiff's claims timely.  *See Nat'l Fair Hous. Alliance, Inc. v. HHHunt Corp.*, 919 F. Supp. 2d 712, 717-18 (W.D. Va. 2013) (collecting cases applying continuing violation doctrine where complaint alleges developer in multi-property cases engaged in a pattern or practice of discriminatory design and construction); *The Equal Rights Ctr. v. AvalonBay Cmtys., Inc.*, No. AW-05-2626, 2009 WL 1153397, at *9 (D. Md. Mar. 23, 2009) (denying motion to dismiss and applying continuing violation doctrine where allegations included discriminatory acts at multiple properties within the limitations period); *Silver State Fair Hous. Council, Inc. v. ERGS, Inc.*, 362 F. Supp. 2d 1218, 1221-22 (D. Nev. 2005) (finding that "the design and construction of multiple FHA-violating housing developments continuing into the limitations period" constitutes a discriminatory "practice that can ensnare discriminatory occurrences that took place outside of the two-year statute of limitations") (internal quotation marks omitted); *see also Barkley v. Olympia Mortg. Co.*, No. 04 Civ. 875 (RJD)(KAM), 2007 WL 2437810, at *16 (E.D.N.Y. Aug. 22, 2007) ("At this relatively early stage in the litigation, such allegations [of continued discriminatory practice at multiple properties persisting into the limitations period] are sufficient to withstand a motion to dismiss on timeliness grounds.").

PMG partnered with JDS to develop 202 Eighth Street, which fails to comply with the law.  Compl. ¶¶ 18, 41.  JDS subsequently partnered with Shop in the design and construction of the American Copper Buildings.  Compl. ¶ 32.  PMG is currently participating in the design and construction of at least one additional residential property in partnership with both JDS and Shop.  Compl. ¶¶ 47-49.  In light of these facts and the reasonable inferences made therefrom –

that the current project also is noncompliant – Plaintiff's claims are timely. *See Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015) ("On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor.") (citing *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 300 (2d Cir. 2006)).

The cases PMG cites to support its contention that the continuing violation doctrine should not toll Plaintiff's claims are distinguishable on the facts, as they do not contain allegations of subsequent discriminatory conduct by the same defendant, as the Amended Complaint here does. *See Garcia v. Brockway*, 526 F.3d 456, 463 (9th Cir. 2008) (finding that "single instance of unlawful conduct … occurred long before plaintiffs brought suit"); *Moseke v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492, 507 (E.D. Va. 2002) ("There is no allegation that Defendants have repeated some discriminatory act of design and construction within the statutory period."); *Fagundes v. Charter Builders, Inc.*, No. C-07-0111 (JF)(HRL), 2007 WL 2113575 (N.D. Cal. July 20, 2007) (no allegations of subsequent discriminatory acts after the construction of single subject property); *United States v. Taigen & Sons, Inc.*, 303 F. Supp. 2d 1129 (D. Idaho 2003) (same); *Kuchmas v. Towson Univ.*, 553 F. Supp. 2d 556 (D. Md. 2008) (same); *accord. Alliance for Disabled in Action Inc. v. Renaissance Enters., Inc.*, 371 N.J. Super. 409, 416 (App. Div. 2004) (certificates of occupancy for some units issued within limitations period). And in *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469, 481 (6th Cir. 2006), the Court specifically noted that "where the plaintiff can show that the owner of several housing developments engaged in a continuous policy or practice with regard to the noncompliant design and construction of each of the developments, the continuing violation doctrine may toll the running of the limitations period until the last unit of all of the implicated developments is sold."

Finally, though the continuing violation doctrine generally may be disfavored in this Circuit, the requisite compelling circumstances exist in this case to warrant its application. *See United States v. Yonkers Bd. of Educ.*, 992 F. Supp. 672, 676 (S.D.N.Y. 1998) (applying continuing violation doctrine to FHA claim where discriminatory decisions were made outside limitations period but continued without remedy such that it amounted to an ongoing discriminatory practice).

## II.      PLAINTIFF'S STATE AND LOCAL LAW CLAIMS ARE ALSO TIMELY

In addition to Plaintiff's federal claims, Plaintiff has asserted claims under the corresponding provisions of the New York State Human Rights Law (N.Y. Exec. Law § 290 *et seq.*) ("NYSHRL") and the New York City Human Rights Law (N.Y.C. Admin Code § 8-107 *et seq.*) ("NYCHRL"). Discrimination claims under the NYSHRL and NYCHRL are subject to a three-year statute of limitations. *See Johnson v. DCM Erectors, Inc.*, No. 15-CV-5415 (PKC), 2016 WL 407293, at *2 (S.D.N.Y. Feb. 2, 2016). These claims are also timely, and PMG's motion to dismiss them should be denied.

The applicable provisions of the NYSHRL essentially parallel the corresponding provisions in the FHA (*compare* N.Y. Exec. Law § 296(5)(a)(1)–(2) *with* 42 U.S.C. § 3604(f)(1)–(2); and N.Y. Exec. Law § 296(18)(3) *with* 42 U.S.C. § 3604(f)(3)(C)), and Plaintiff's claims under the statute are treated as coextensive with its FHA claims. *See, e.g.*, *Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 269-70 (E.D.N.Y. 2009) (where provisions were parallel, "plaintiffs' claims under the NYSHRL survive[d] dismissal to the extent that the FHAA claim [did]") (citation omitted); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014) ("Claims under the FHA and HRL § 296 are 'evaluated under the same framework.'") (citation omitted); *Martinez by Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270, 278

(S.D.N.Y. 2018), *appeal dismissed* (Nov. 20, 2018) ("Housing discrimination claims brought under the NYSHRL are similarly analyzed under the same framework as claims brought under the FHA.") (citation omitted).[7]

The NYCHRL, including the provision applicable here, *see* N.Y.C. Admin. Code § 8-107(5)(a)(1), is construed even *more* broadly than the FHA or NYSHRL. The Second Circuit has made clear that in the wake of the Local Civil Rights Restoration Act of 2005, the NYCHRL must serve as "a one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a *floor* below which the City's Human Rights Law cannot fall." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation and quotation marks omitted, emphasis in original). The NYCHRL's provisions thus must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those with provisions comparably-worded to provisions of this title[,] have been so construed." *Id.*; *see also Kumar v. New York City Sch. Constr. Auth.*, No. 10 Civ. 3559 (PKC)(FM), 2011 WL 5929005, at *8 (S.D.N.Y. Nov. 29, 2011) ("When a court is presented with an issue of statutory construction, the NYCHRL is to be construed more liberally than the federal standards and the NYSHRL.").

Like the FHA, the NYSHRL and NYCHRL both prohibit discrimination against disabled persons in the sale or rental of housing, including the "den[ial]" or "withhold[ing]" of housing accommodations from people with disabilities. *See* N.Y. Exec. Law § 296(5)(a)(1), 296(18);

---

[7] Some cases have held that the NYSHRL is to be interpreted more broadly than the FHA. *See, e.g.*, *2 Perlman Drive, LLC v. Stevens*, 54 Misc.3d 1215(A) (N.Y. Civ. Ct. 2017) ("[S]tate law provides greater disability protection than [F]ederal law, and [C]ity law provides even broader disability protections than the [S]tate law.").

N.Y.C. Admin. Code § 8-107(5)(a)(1).  As discussed above, as long as inaccessible features remain unremedied, PMG continues to discriminate against people with disabilities, deny people with disabilities access to the buildings, and withhold housing from them.  As with the FHA, then, as long as the non-compliant features persist, the discrimination is ongoing, and the statute of limitations does not even begin to run, let alone run out.

Even if the Court were to decline to hold that the statute of limitations begins to run when the discriminatory features are remedied or when the plaintiff is injured, the continuing violation doctrine and discovery rule would both apply to toll the limitations period for the state and municipal claims for the same reasons discussed above in the federal context.

PMG's assertion that the discovery rule does not apply to Plaintiff's NYSHRL and NYCHRL claims – even though it is settled that the rule applies to FHA claims – is plainly incorrect.  In the single case cited by PMG in support of this proposition, *St.-Jean v. Emigrant Mortg. Co.*, No. 11-CV-2122(SJ)(JO), 2014 U.S. Dist. LEXIS 136563 (E.D.N.Y. Mar. 31, 2014), the magistrate judge concluded, without any citations or analysis, that the discovery rule was inapplicable to the state and local claims.  *Id.* at 41.  The only two cases that the defendant in that case cited in its briefing did not involve NYSHRL or NYCHRL claims at all, but rather contract claims under the Uniform Commercial Code; neither case made any pronouncements about the application of a discovery rule to other state or municipal claims, and certainly not to statutes as protective and broad as the NYSHRL and NYCHRL.[8]  While it does not appear that any other court has directly addressed the question of whether the discovery rule should apply to claims brought under the NYSHRL and the NYCHRL, it would be contrary to the laws' purposes to

---

[8] The district court later reversed the magistrate judge's dismissal of the state and municipal claims, finding that they were equitably tolled.  *St.-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 317-18 (E.D.N.Y. 2014).

hold that it does not. In light of the established requirements that the NYSHRL should be interpreted consistently with the FHA and that the NYCHRL must be construed more broadly than the FHA, which provide a "floor" of protection below which the NYCHRL cannot fall, it cannot be the case that the discovery rule applies to Plaintiffs' FHA claims but not to Plaintiffs' state and municipal claims.

## CONCLUSION

For the reasons stated above, PMG's motion to dismiss Plaintiff's claims against it should be denied.

Dated: New York, New York
August 7, 2019

CUTI HECKER WANG LLP

By:＿＿＿/s/ Alice G. Reiter＿＿＿＿＿
Mariann Meier Wang
Alice G. Reiter
Heather Gregorio

305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600
mwang@chwllp.com
areiter@chwllp.com
hgregorio@chwllp.com

*Attorneys for Plaintiff Fair Housing Justice Center, Inc.*